UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TRUSTLABS, INC.,

          Plaintiff,

v.

DANIEL JAIYONG AN,

          Defendant.

Case No.  21-cv-02606-CRB   (TSH)

**DISCOVERY ORDER**

Re: Dkt. Nos. 75, 86

      Plaintiff has filed a motion for a protective order to limit the number of depositions Defendant can take.  Defendant has stated an intention to depose ten individuals, which is the number ordinarily allowed under Rule 30.  Plaintiff is willing to provide Rafael Cosman (Plaintiff's co-founder, former CTO and current director) and Zean Moore for deposition, but seeks to bar the depositions of Alex de Lorraine (Plaintiff's interim CEO and former COO and Head of Finance), Tom Shields (member of Plaintiff's Board), Anna Arpilleda (Plaintiff's Head of People), Bill Wolf (Plaintiff's Chief Investment Officer), Ryan Christensen (member of Plaintiff's Board), Michael Bland (Plaintiff's Associate General Counsel), Diana Bushard (Plaintiff's General Counsel) and Joseph Perkins (Plaintiff's outside counsel at Orrick).

      Plaintiff observes that its three claims for relief all primarily relate to Defendant's deletion of the company's Slack account in retaliation for efforts to remove him as CEO.  Plaintiff argues that ten depositions is not proportional to the needs of the case.  With respect to Wolf, Plaintiff argues that he was a part-time contractor with Plaintiff and not involved in the company's day-to-day operations during the relevant time period.  For Christensen, Plaintiff says he was neither contracted with nor employed by Plaintiff during the relevant time.  Plaintiff also asserts that de Lorraine, Shields, Christensen, Arpilleda and Wolf are apex witnesses.  Plaintiff further argues

that depositions of Bland, Bushard and Perkins are inappropriate because they are Plaintiff's attorneys.

Defendant responds that Plaintiff listed de Lorraine, Arpilleda and Bland in its Rule 26 initial disclosures as "individuals [who] may have discoverable information that Plaintiff may use to support its claims . . ." Defendant argues there is no good cause to limit the number of depositions he may take. He also offers the following witness-by-witness explanation of why he wants each deposition, which the Court quotes below:

(i) Alex de Lorraine: Alex, the Plaintiff's Interim CEO, possesses comprehensive knowledge and information regarding the separation. Alex played a significant role in orchestrating the separation and was actively involved in using the Slack account. Moreover, Alex is well aware of the positions and responsibilities related to the separation within the Plaintiff's Company. The Deposition of Alex would be crucial to this claim. In addition Alex de Lorraine was guaranteed a promotion by Rafael Cosman from Director of Finance to COO if the vote-out were carried out.

(ii) Tom Shields: Tom is a member of Plaintiff's Board of Directors and possesses comprehensive knowledge regarding the functions, operations, and decision-making processes within the Plaintiff's company. This includes matters such as promotions and separation of an individual in the Plaintiff's Company. The deposition of Tom is crucial to this claim as he can provide vital information regarding removal from company. In addition Tom Shields was guaranteed a promotion by Rafael Cosman from Advisor to Board Member if the vote-out were carried out.

(iii) Anna Arpilleda: Anna is Plaintiff's Head of People and has all knowledge and information regarding the terms of separation and the timeline of events surrounding the Slack account on July 6, 2020. Anna is well-informed about the events that occurred both prior to and after the events, which are crucial to the current claim.

(iv) Bill Wolf: Bill Wolf, as a sitting board observer at the time of events, was privy to

2

|   |   |   |
|---|---|---|
|   |        | the events surrounding separation, and is aware of knowledge and information critical for counter-claims, as Bill and I had a phone call shortly after the separation. |
|   | (v)    | Ryan Christensen: Ryan Christensen, as CEO, possesses Non-privileged information knowledge and information critical for counter-claims. This will be more clear after I file the motion to leave for counterclaims prior to this protective order hearing date on June 27. |
|   | (vi)   | Michael Bland: Michael Bland possesses Non-privileged information about events surrounding separation, and is aware of knowledge and information critical for counter-claims, as many emails were exchanged between myself, Michael, and Tim Welsh, senior legal counsel at the time. This will be more clear after I file the motion to leave for counterclaims prior to this protective order hearing date on June 27. |
|   | (vii)  | Diana Bushard: Diana Bushard, as General Counsel, possesses Non-privileged information knowledge and information critical for counter-claims. This will be more clear after I file the motion to leave for counterclaims prior to this protective order hearing date on June 27. |
|   | (viii) | Joseph Perkins: Joseph Perkins and I discussed at length a potential vote-off, and Joseph recommended that I do not concern myself and continue to operate the company, because (1) he had not heard of anyone bringing forth or mentioning a vote-out to him, (2) it is unclear if proper process for the vote-off occurred, and (3) Joseph is the only one who can clearly indicate, as a neutral party between separation of a CEO and one of two board members when the exact moment occurred for separation, and if in fact, it was carried out according to the Company Bylaws and Delaware General Corporate Law (DGCL). |

In order to decide what is relevant and proportional to the needs of the case, we first have to decide what this lawsuit is about. This is a little bit tricky because the allegations in the

3

Complaint sweep way more broadly than the claims for relief do.  Plaintiff alleges that the Defendant co-founded Plaintiff in 2015 and was its President and CEO and a member of the Board until his termination in 2020.  Complaint ¶ 13.  Plaintiff alleges that in early 2020, "multiple employees noticed instances of Jaiyong [the Defendant] making major company decisions unilaterally and acting against the best interests of the Company." *Id*. ¶ 14.  The Complaint alleges that the Defendant "refused to name project managers to or develop project plans for major company initiatives in Q1 2020, against the advice of the management team," "unilaterally declared a policy of video recording all Company meetings, resulting in additional post facto work" to address GDPR privacy concerns, "launched a message board application" to communicate with purchasers "without prior discussion with the management team and legal counsel," and other wrongful conduct.  *Id*.

Plaintiff alleges that "[b]ased on concerns arising from these and other events, multiple employees and stockholders of the Company approached senior Company executives to express their belief that Jaiyong should be removed from his role as CEO.  During the week of June 29, 2020, Rafael Cosman, CTO and co-founder, and Alex de Lorraine, COO & Head of Finance, shared these concerns with Jaiyong and began to discuss the possibility of reassigning the duties of CEO/President to Mr. Cosman." *Id*. ¶ 15.  The Complaint recounts that "[b]y July 3, 2020, Mr. Cosman and Mr. de Lorraine were left with the impression that Jaiyong would provide TrustLabs with a resignation letter by 4 pm Pacific Time on Monday, July 6th.  Jaiyong never provided TrustLabs with a resignation letter.  Instead, at 6:36 pm on July 6th, the Company's Slack messaging system was deleted." *Id*. ¶ 16.

Further, "[t]he Company's Slack services were registered under Jaiyong's trusttoken.com email address and Jaiyong was the sole administrator of the Company's Slack platform.  Jaiyong was the only person at the Company who had the physical and technical access to delete the Slack platform.  In the week leading up to the deletion of the Slack platform the Company's IT Security Department created a backup copy of prior messages because of concerns about Jaiyong's increasingly erratic behavior." *Id*. ¶ 17.  "TrustLabs immediately began extraordinary efforts to protect its other Company assets, including by securing Company computer systems, changing

4

login information, confirming that digital assets required sign-off of multiple individuals to be moved, and removing Jaiyong's access to social media accounts.  TrustLabs incurred significant costs to protect its assets from Jaiyong, including the value of time spent by the Company's IT Security Department." *Id*. ¶ 20.

Finally, "[o]n the evening of July 6th, within a few hours after TrustLabs discovered Jaiyong deleted the Slack system, TrustLabs' Board of Directors held an emergency meeting (after normal business hours) to remove Jaiyong from the Board of Directors and terminate his employment as CEO/President, effective on July 7, 2020." *Id*. ¶ 21.  "On July 8, 2020, TrustLabs sent Jaiyong a notice of termination and demanded that he return Company-issued equipment in his possession, including an Apple MacBook Pro laptop, an Apple iPad Pro tablet computer, and an Apple iPhone, via FedEx courier service." *Id*. ¶ 22.

So, while it is true that all three claims for relief relate to the Defendant's deletion of the company's Slack account and his attempted access to other company systems after he was fired, there is a story that Plaintiff wants to tell about that, and this story involves a lot of people.  The story involves "multiple employees notic[ing] instances of Jaiyong making major company decisions," *id*. ¶ 14, "the advice of the management team," *id*. ¶ 14(a), the failure to have "prior discussion with the management team and legal counsel," *id*. ¶ 14(c), "multiple employees and stockholders of the Company approach[ing] senior Company executives," *id*. ¶ 15, and an emergency meeting by the Board of Directors.  *Id*. ¶ 21.

We have to assume the Complaint describes the story Plaintiff wants to tell at trial.  After all, to make the case understandable, Plaintiff will have to ascribe a motive to the Defendant, and so there will need to be some witness testimony about what led up to the deletion of the Slack account and the other attempts at access.  Indeed, since Plaintiff seeks punitive damages on each of its claims, the events that led up to the allegedly improper computer access may be quite important to show that Defendant had the requisite state of mind.  On the other hand, extensive testimony about every poor business decision the Defendant made in the first six months of 2020, and many hours of contrary testimony by the Defendant that these were in fact great business decisions, could get tedious, bog down the trial and distract the trier of fact, as this case is not

actually an employment dispute.

The Court thinks that the full scope of the story as alleged in the Complaint is relevant for discovery purposes, and just how much of that story makes it in at trial is for the district judge to decide. To paint the picture, Plaintiff is likely to put on testimony about the Defendant becoming erratic and using bad judgment in the first half of 2020. Probably the Plaintiff will use examples to make the point. Defendant does not know in advance which particular projects or anecdotes will get mentioned. Plaintiff is also likely to have a witness or witnesses testify about some of the complaints to senior company executives. Again, for time management purposes Plaintiff will likely pick a few good examples. And of course, Defendant doesn't know right now which complaints or senior executives will get mentioned at trial. The basic purpose of discovery is to learn what your opponent's case is so you're not surprised at trial. The Court thinks Plaintiff's case is fairly broad in scope, it involves a bunch of people, and it seems to involve people at the highest levels in the company. Accordingly, the Court will allow discovery that is proportional to that scope. The Court understands that a large amount of that scope will not likely come in at trial, but the Court can't guess which parts that will be. Likely no one will know that for sure until the eve of trial, long after fact discovery has closed.

Therefore, given the breadth of this case, at least for discovery purposes, there is nothing wrong in principle with the Defendant taking ten depositions. Plaintiff's apex argument also falters, for two reasons. First, Plaintiff submits no evidence that any of these people qualifies as an apex witness. Plaintiff's argument is based solely on the job title each witness has, with no information provided about how big the company is or how many employees these witnesses supervise. There are any number of small technology companies where every employee has a fancy title. Those are not apex witnesses. Nor is a Board member automatically an apex witness utterly without regard for how large the company is. Here, Plaintiff has not provided evidence to substantiate its apex argument; job titles are not enough. Second, even if Plaintiff had provided such evidence, the story alleged in the Complaint plainly involves senior management at the company and the company's Board of Directors. Senior management and Board members were the actual participants in the events in question. To competently take discovery concerning the

6

alleged events, Defendant has to depose those people.

Having gotten those general principles out of the way, let's go through each witness:

<u>Alex de Lorraine.</u>  Defendant argues that de Lorraine played a significant role in orchestrating his separation.  Paragraphs 15 and 16 of the Complaint state that as well.  Defendant claims that de Lorraine was guaranteed a promotion by Cosman if the vote-out were carried out.  While that is just an allegation, it may be worth exploring in discovery.  Further, Plaintiff listed de Lorraine in its initial disclosures as a witness who may have discoverable information that Plaintiff may use to support its claims.  Having listed de Lorraine in its initial disclosures, Plaintiff is free to call him to testify at trial, and it would be unfair to deny Defendant this deposition.  Defendant may depose de Lorraine.

<u>Tom Shields.</u>  Shields is a Board member.  Defendant says that Shields "possess comprehensive knowledge regarding the functions, operations, and decision-making processes within the Plaintiff's company," including "matters such as promotions and separation of an individual in the Plaintiff's Company," which is quite vague and non-specific to this lawsuit.  Defendant also says that Shields was guaranteed a promotion from Advisor to Board Member if the vote-out were carried out, which implies he wasn't a Board member at the time of the vote.  Even in the broad story told in the Complaint, it doesn't sound like Shields was a participant in it.  He may have observed things, but he didn't do them.  Also, this case isn't about people other than the Defendant who were promoted or separated from the Company.  Plaintiff has shown good cause to bar Shields' deposition.

<u>Anna Arpilleda.</u>  Defendant states that Arpillda "is Plaintiff's Head of People and has all knowledge and information regarding the terms of separation and the timeline of events surrounding the Slack account on July 6, 2020."  That sounds relevant, and Plaintiff seems to agree she has relevant information, as it listed her in its initial disclosures.  Again, listing Arpilleda in its initial disclosures paved the way for Plaintiff to call her as a witness at trial, and Defendant has every right to use discovery to prepare for that.  He may depose Arpilleda.

<u>Bill Wolf.</u>  Defendant says that Wolf was a Board "observer" at the time of the relevant events.  That doesn't sound like he was a participant in them, though.  That aligns with Plaintiff's

assertion that Wolf was a part-time contractor and not involved in the day-to-day company operations at the time. Defendant says that he and Wolf had a phone call shortly after the separation, but doesn't explain why the phone call is relevant. He also says that Wolf is aware of knowledge and information critical for Defendant's forthcoming counterclaims. However, the Court doesn't know what those counterclaims are, and in any event, discovery has to be relevant to existing claims. Defendant was supposed to put his arguments in favor of these depositions in his opposition to the motion for a protective order; he is not allowed to bypass the court-ordered deadline to oppose the motion by saying that Wolf's relevance will be revealed at a future time. Plaintiff has shown good cause to bar Wolf's deposition, at least as the pleadings stand now.

Ryan Christensen. Defendant says that Christensen possesses information relevant to the forthcoming counterclaims. Again, discovery has to be relevant to existing claims, not future ones, and Defendant was supposed to explain his need for this deposition in his opposition brief. For its part, Plaintiff says that Christensen was neither employed by nor contracted with Plaintiff during the relevant time period, an assertion Defendant does not rebut. Plaintiff has shown good cause to bar Christensen's deposition.

Michael Bland. Defendant states that he exchanged "many" emails with Bland and Timothy Welsh during the relevant time period. The Court observes that Plaintiff listed both Bland and Welsh on its initial disclosures, stating they have "[n]on-privileged information about Defendant's employment, including, but not limited to, Defendant's pre-termination erratic behavior, Defendant's termination, Defendant's deletion of Plaintiff's Slack account and/or workspace, and Plaintiff's actions taken in response to Defendant's deletion of Plaintiff's Slack account and/or workspace." The Court understands the many good reasons for not allowing a litigant to depose his opponent's attorney, but there is no indication that Bland is litigation counsel, and Plaintiff itself has taken the position that Bland has *non-privileged* relevant knowledge about issues that are core to the case. Further, by listing Bland on its initial disclosures, Plaintiff is free to call him as a witness at trial. The only way for Defendant to discover what Bland may say at trial is to depose him. Under the circumstances, it would be inequitable to bar his deposition. Defendant may depose Bland.

8

Diana Bushard. Defendant says that Bushard is Plaintiff's General Counsel. His only attempt at demonstrating relevance is a reference to his forthcoming counterclaims. For the reasons already stated, that's not enough. Plaintiff has shown good cause to bar Bushard's deposition.

Joseph Perkins. Defendant says that he personally spoke with Perkins "at length" about a potential vote-off, and that Perkins recommended that he should not be concerned and should continue to operate the company. If that is true, it could present a significantly different view of Defendant's conduct. The story told in the Complaint is of the Defendant's increasingly erratic behavior that was detrimental to the company. If outside counsel was advising the Defendant not to be concerned about a vote-off and to continue operating the company, that could make the expected testimony of Plaintiff's witnesses look exaggerated and less believable. Further, based on the information available to the Court, it appears that Perkins may be the only witness who could serve that corroborating role for Defendant. There are, again, good reasons to avoid having the other side's counsel be deposed, but there is no indication that Perkins was litigation counsel. The Court also does not see how Perkins' recommendations to Defendant could be shielded by privilege from the very person he spoke to. Further, at trial Defendant may want to point to Perkins' recommendations as part of his defense, but that may suffer from a hearsay problem without Perkins' own testimony. Defendant may depose him.

Accordingly, the Court **GRANTS** Plaintiff's motion for a protective order as to Shields, Wolf, Christensen and Bushard and **DENIES** the motion as to de Lorraine, Arpilleda, Bland and Perkins. The motion having been ruled on, the Court **CANCELS** tomorrow's hearing.

Separately, Defendant has filed a motion to extend the date on the hearing on the motion for a protective order from June 27 (tomorrow, i.e., the hearing the Court just canceled) to July 7, 2023. He notes that he previously said he would file a motion for leave to assert his forthcoming counterclaims. He says he would like to make a good faith effort at resolving this lawsuit before proceeding with that filing, and proposed having a neutral conduct a call between him and Cosman to that end. The Court encourages the parties to make a good faith effort to resolve this lawsuit. However, the request to postpone the June 27 hearing is **DENIED**. The June 27 hearing

9

concerned a discovery motion that was referred to the undersigned magistrate judge. If Defendant files a motion for leave to file counterclaims, he will need to notice that for a hearing before the district judge. In other words, these are different hearings in front of different judges. Further, while the Court realizes that Defendant intends to use the pendency of his forthcoming motion for leave to add counterclaims to argue that certain depositions are relevant, until that motion is granted and the counterclaims are actually in the case, the Court will not use the counterclaims to determine relevance.[1]

**IT IS SO ORDERED.**

Dated: June 26, 2023

THOMAS S. HIXSON
United States Magistrate Judge

---

[1] The Court **DENIES** Defendant's request for sanctions without prejudice to filing a proper motion for sanctions. *See* Civil Local Rule 7-8(a) (motion for sanctions must be separately filed and noticed under Rule 7).